## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**Antonio Jackson,**
*individually and on behalf of a class of*
*similarly situated persons,*

    *Plaintiff,*

v.

**TrueAccord Corp.,**
**Skytrail Servicing Group, LLC** *and*
**William C. Pruett**

    *Defendants.*

Case Number:

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

COMES NOW the Plaintiff, **Antonio Jackson** ("**Mr. Jackson**"), on behalf of himself and all similarly situated individuals, by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, **TrueAccord Corp.** ("**TrueAccord**"), **Skytrail Servicing Group LLC ("STS"),** and **William C. Pruett** ("**Pruett**") (collectively, the "**Defendants**"), stating as follows:

## DESCRIPTION OF THE CASE

1.    This is an action against TrueAccord for violations of the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et. seq.* ("**FDCPA**"), against TrueAccord, STS, and Pruett for violations of the *Florida Consumer Collection Practices Act*, Section 559.55, Florida Statutes *et. seq.* ("**FCCPA**"), and against STS and Pruett for violations of

the **Civil Remedies for Criminal Practices Act** ("**CRCPA**"), Section 772.101 Florida Statutes, *et. seq.*

2.      Florida law prohibits usury and caps interest rates at 18% annually.  Interest rates of 45% and higher are deemed a felony.  *See* Section 687.071(3), Florida Statutes. Loans made at usurious rates are *void ab initio* under Florida law.

3.      STS and Pruett operate an online lending business called Sky Trail Cash which makes loans to Florida residents at rates exceeding 700% annual interest— more than 30 times the maximum lawful rate.

4.      Generally, STS and Pruett collect these debts in-house. However, they assign certain debts for collection to TrueAccord, a "debt collector" as defined by the FDCPA. Despite the loans being void due to their triple-digit interest rates, TrueAccord attempts to collect these debts anyway, falsely representing to Florida consumers that the debts are legally owed and enforceable against them.

## JURISDICTION AND VENUE

5.      Subject matter jurisdiction arises under the FDCPA, 15 U.S.C. § 1692k(d), the FCCPA, Section 559.77, Florida Statutes, the CRCPA, Section 772.104, Florida Statutes, and 28 U.S.C. § 1331.

6.      This Court has supplemental jurisdiction for Mr. Jackson's state law claims pursuant to 28 U.S.C. § 1367.

7.     TrueAccord is subject to the provisions of the FDCPA and the FCCPA, STS and Pruett are subject to the provisions of the FCCPA and the CRCPA, and all Defendants are subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

8.     Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action occurred within this District.

## PARTIES

### Mr. Jackson

9.     **Mr. Jackson** is a natural person residing in Orlando, Orange County, Florida, and a *Consumer* as defined by the FDCPA and the FCCPA, 15 U.S.C. § 1692a(3) and Section 559.55(8), Florida Statutes, respectively.

### TrueAccord

10.     **TrueAccord** is a Delaware corporation with a primary business address of **303 Second Street, Suite 750, San Francisco, CA 94107**.

11.     TrueAccord is registered to conduct business in the State of Florida, where its Registered Agent is **Incorp Services, Inc., 17888 67th Ct. N., Loxahatchee, FL 33470.**

12.     TrueAccord is a *Debt Collector* within the meaning of the FDCPA and the FCCPA, 15 U.S.C. § 1692a(6) and Section 559.55(7), Florida Statutes, respectively, in that it uses e-mail, an instrumentality of commerce, interstate and within the State of Florida, for its business, the principal purpose of which is the collection of debts, and/or it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

13.     TrueAccord is registered with the Florida Office of Financial Regulation as a *Consumer Collection Agency* ("**CCA**"), holding license number **CCA9903295**. **SEE PLAINTIFF'S EXHIBIT A**. As a licensed CCA, TrueAccord knows or should know the requirements of both the FDCPA and the FCCPA.

### STS

14.     **STS** is a Texas limited liability company that conducts online lending via its website, www.skytrailcash.com.

15.     Despite lending to consumers in Florida, STS has not registered with the Florida Office of Financial Regulation as a foreign company transacting business in Florida and holds no Florida licenses.

16.     STS' main business address is **5904 Summerfield Dr., Texarkana, TX 75503.**

17.     STS' Texas registered agent is **Incorp Services, Inc., 815 Brazos St., Suite 500, Austin, TX 78701.**

### Pruett

18.     **Pruett** is a natural person, and on information and belief, the only officer and director of STS. Pruett resides at **6801 Summerhill Road, Texarkana, TX 75503**.

19.     Pruett can be served at his office for STS, located at **5904 Summerfield Dr., Texarkana, TX 75503**.

## FACTUAL ALLEGATIONS

20.     According to TrueAccord, Mr. Jackson allegedly obtained a payday loan (the "**Debt**") from an internet-based payday lender purportedly owned and operated by the Lac du Flambeau Band of Lake Superior Chippewa Indians ("**LDF Tribe**"), doing business as **Sky Trail Cash** from the website skytrailcash.com.

21.     The Debt arose from a transaction which was primarily for family, personal, and household purposes, specifically a payday loan for personal purposes and expenses, and meets the definition of *Debt* under the FDCPA and the FCCPA, 15 U.S.C. § 1692a(5) and Section 559.55(6), Florida Statutes.

22.     The interest rate charged was 780% annually, meaning that Mr. Jackson was to repay $1,000 over a 4-month period for a $275 loan.

23.     Mr. Jackson paid over $700 for the $275 he borrowed.

24.     Despite this, Sky Trail Cash claimed he still owed $367.67.

25.     At all times relevant, Mr. Jackson has been a Florida resident.

26.     Mr. Jackson allegedly took out the payday loan in Orange County, Florida, and the proceeds from the loan were electronically transmitted to his bank account in an Orlando bank, via an ***Automated Clearing House*** ("**ACH**") credit.

27.     Recently, federal appellate courts have held that a transaction takes place, for jurisdictional purposes, where a consumer is located when they click "submit" while visiting an online portal provided by a Native American tribe. *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a

bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

28.     Mr. Jackson has never visited LDF tribal land in Wisconsin.

29.     Thus, Mr. Jackson's loan occurred in Florida, is governed by the laws of Florida, and the alleged transaction occurred within Florida.

30.     Section 687.071(3), Florida Statutes, states that "any person making an extension of credit to any person, who shall willfully and knowingly charge, take, or receive interest thereon at a rate exceeding 45 percent per annum or the equivalent rate for a longer or shorter period of time, whether directly or indirectly or conspire so to do, commits a felony of the third degree." (Emphasis added.)

31.     Pursuant to Section 687.071(7), Florida Statutes, no loan made in violation of this statute is an enforceable debt in the State of Florida.

32.     Any person who willfully makes such a loan, in addition to criminal sanctions, forfeits the right to collect payment for the loan, including the principal, as such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935). *See also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966); *Rollins v. Odom*, 519 So. 2d 652, 655 (Fla. Dist. Ct. App. 1988).

33.     The loan from which the Debt arose is thus void and unenforceable in Florida.

34.     Sky Trail Cash was never licensed by the Florida Office of Financial Regulation as a payday lender, nor was it a federally chartered bank, nor did it hold any kind of regulatory license.

35.     Sky Trail Cash relies on choice-of-law provisions and a spurious claim of sovereign immunity in its efforts to lend to Florida consumers at interest rates that violate Florida's usury statutes.

36.     Indeed, Sky Trail Cash *claims* to be wholly owned and operated by the LDF Tribe, a sovereign nation located within the United States of America. Sky Trail Cash is purportedly operated by Ningodwaaswi, LLC, a tribally chartered company incorporated under the laws of the LDF Tribe.

37.     Despite such claims, the true beneficial owner of Sky Trail Cash is Pruett, a long-time Texas "payday loan" titan, who has owned and operated many storefront payday lenders and similar businesses since the 1990s.

38.     Public records show dozens of companies registered with the Texas Secretary of State in Pruett's name, including Gladewater Cash Now LLC, Texarkana EZ Cash Advance Inc., Sulphur Springs Cash Express LLC, and others.

39.     Texas law limits the fees that licensed payday lenders can charge to an initial $10 fee plus $4 per $100 borrowed per month. Thus, a lawful Texas lender could charge a maximum of $130 in interest and fees for a $500 loan, repaid over a 6-month period.

40.     In contrast, skytrailcash.com shows an identical loan charging $1,375.96 total, with $875.96 in interest - an annual interest rate of 520%.

41.     Black's Law Dictionary defines *Loansharking* as: "The practice of lending money at excessive and especially usurious rates, and often using threats or extortion to enforce payment." The loans offered by Sky Trail Cash fall squarely within this definition.

42.     Prior to 2010, many online lenders utilized "choice of law" provisions, requiring borrowers to agree to the laws of Utah or Delaware to govern their loan contracts because these states have no *per se* cap on interest rates.

43.     While New Mexico had no cap on interest rates, in 2014, their state Supreme Court determined that a lender's 1100% interest rate was illegal as it constituted an unconscionable business practice. *See State of New Mexico vs. B&B Investment Group., d/b/a Cash Loans Now*, New Mexico Supreme Court, June 26, 2014, Docket No. 34,266.

44.     After a series of court decisions unfavorable to payday lenders, many lenders pivoted, entering into arrangements with financially desperate American Indian tribes.

45.     In exchange for a small share of the profits, the tribes would become the straw owners of a lending enterprise and claim that the loans were made on their reservation, under their tribal laws, providing a colorable claim of sovereign immunity from state criminal prosecution for loan sharking.

46.     Such arrangements are referred to as "rent-a-tribe" schemes because the main function of the Indian tribe is to appear to control the lending operation so that the lender qualifies for sovereign immunity, theoretically restricting the filing of criminal and/or civil charges by state regulatory authorities.

47.     Sovereign immunity does not, however, turn an otherwise illegal loan into a legal one; at best, it potentially creates a defense to criminal or civil prosecution of the crime. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

48.     While there have been some high-profile criminal prosecutions of non-tribal lenders engaging in "rent-a-tribe" schemes (perhaps most notoriously, Scott Tucker, who was sentenced in 2018 to 16 years in a federal correctional facility for engaging in one of the largest documented "rent-a-tribe" schemes), the use of these schemes is a calculated gamble: the risk of being caught is low, and the profit potential is high.

49.     Thus, these schemes continue to perpetuate, with the non-tribal puppet masters giving the tribal entity little actual authority and controlling the way the loans are marketed, underwritten, collected, and serviced.

### Records Show SkyTrailCash.com Registered to Pruett

50.     While the LDF Tribe claims to operate skytrailcash.com, records from the Domain Name Registration database indicate that the website skytrailcash.com was registered on March 23, 2012, to My Cash Center, LLC, 1614 Hampton Rd., Texarkana, TX 75501. **SEE PLAINTIFF'S EXHIBIT B.**

51.     Similarly, the database indicates that both the administrative and technical contact are listed as John Humphrey ("**Humphrey**"), jhumphrey@dmpinvestments.net,

My Cash Center, LLC, 1614 Hampton Rd., Texarkana, TX 75501, phone (903) 794-0013. *Id*.

52.     Humphrey is the Chief Financial Officer of DMP Investments LLC, a company owned by Pruett.

53.     As of 2018, registration of the skytrailcash.com website was switched to Domains By Proxy, LLC, a service which enables its clients to register web domains anonymously; the physical address, email address, and phone numbers of Domains By Proxy, LLC, then appear in registration records in an effort to prevent anyone from learning the actual registrant's name. **SEE PLAINTIFF'S EXHIBIT C.**

54.     Despite hosting the Sky Trail Cash website, the computer servers are located far from the LDF Tribe's land - an IP address of 45.79.4.217 corresponds to a physical location in Dallas, Texas. The internet service provider is Linode, LLC. **SEE PLAINTIFF'S EXHIBIT D.**

55.     The address appearing on Domain Name Registration records for skytrailcash.com, 1614 Hampton Rd., Texarkana, TX, is a commercial building with the name "Roundstone" prominently displayed on the exterior. **SEE PLAINTIFF'S EXHIBIT E.**

56.     Records from the Texas Secretary of State show that Roundstone Professional Services Group, LLC ("**Roundstone**"), previously listed 1614 Hampton Rd., Texarkana, TX, as its primary address.

57.     Pruett is the managing member of Roundstone, and Roundstone currently lists 5904 Summerfield Dr., Texarkana, TX as its primary address, similarly to Pruett's other businesses.

### LDF Tribe Engages in Myriad Rent-A-Tribe Schemes

58.     The LDF Tribe, through LDF Holdings, is perhaps the most active of all the federally recognized Indian tribes in term of renting its sovereign immunity, having dozens of simultaneously active "rent-a-tribe" schemes with dozens of non-tribal investors.

*59.*     In 2010, the LDF Tribe defaulted on a $50 million bond, the proceeds of which were used to fund a failed casino. *See Cary Spivak, Judge Refuses to Name Receiver for Casino, Milwaukee Journal Sentinel, Jan. 10, 2010, http://archive.jsonline.com/business/81102077.html/.*

60.     Facing dire economic circumstances, the Tribe looked for other ways to shore up its finances.

61.     An article published in the Tribe's newsletter, *Inwewin*, in July 2013 noted that the Tribe would be embarking on a new internet lending business. The article stated that "[s]ome view payday loan and internet lending businesses as predatory, with companies taking advantage of individuals already in unpleasant financial situations."

62.     Given the Tribe's poor economic situation and extremely poor credit history, it would have been unable to obtain credit from traditional sources to fund its new payday lending operations.  Moreover, the LDF Tribe had no experience in payday lending or knowledge as to how to underwrite, collect, or service payday loans.

63.     Lacking both capital and experience, and in desperate need of money, the Tribe rented out one of its few remaining assets, its sovereign immunity, to non-tribal persons and entities who agreed to pay the Tribe a small percentage of each loan – about 3% – as a fee or commission.

64.     For each new investor agreement, LDF Tribe mints a new "tribal" limited liability company, organized under tribal law.  Each new investor runs his or her own "tribally owned" website, offering consumers loans at interest rates of its own choosing – generally between 450% and 1100% annually. Most of the LLCs are named after words in the Ojibwe language to further create a facade of "tribal" ownership; *e.g., "*ningodwaaswi" means "six."

65.     Over time, the LDF Tribe, through LDF Holdings, became one of the most prolific purveyors in the rental market for sovereign immunity, renting itself out to over **50 different** non-tribal investors, both domestic and international.

66.     Remarkably, despite supposedly owning a multitude of different payday loan websites, transacting tens of millions of dollars in total revenues per month, a feat which would require hundreds, if not thousands, of employees in aggregate, each and every payday lending website purportedly owned by the LDF Tribe states its business office to be at the same location: 597 Peace Pipe Rd., 2nd Floor, Lac Du Flambeau, WI 54538. This address is a small building, the first floor of which previously housed the LDF Smoke Shop – a small tobacco selling business which also offered pizzas to those calling in advance.

67.     The president of LDF Holdings, Jessi Lee Phillips Lorenzo ("**Lorenzo**"), is not a member of the LDF Tribe, and instead lives in upscale apartment complex in Tampa, Florida.

68.     Lorenzo previously worked for Triax Management & Dater Portfolio between August 2015 and December 2016 as "**Director Of Sovereign Sales.**" She has described her former employer's business model of selling sovereign immunity to non-tribal entities as follows: "Our success formula is simple: ***Identify Great Tribes, Financiers, Servicers and Best in Class Legal Teams*** and have them work cooperatively to build a very profitable compliant business based upon consumer satisfaction." (Emphasis added.)

69.     The frequency with which LDF Holdings creates tribal companies specifically to benefit particular non-tribal individuals, combined with the fact the president of LDF Holdings is a non-tribal member apparently hired for her expertise in crafting "rent-a-tribe" agreements, strongly suggests that LDF Holdings is more of a rental agency than an actual lender.

### Pruett's Other "Rent-A-Tribe" Deals

70.     Pruett operates other usurious online payday lenders through similar "rent-a-tribe" agreements, including River Bend Cash (www.riverbendcash.com). Riverbend Cash is an online payday lender that offers loans at interest rates near, and sometimes exceeding, 800%.

71.     According to its website, riverbendcash.com, "Riverbend Finance, LLC d/b/a Riverbend Cash and RiverbendCash.com are Native American owned businesses organized under the laws of the Fort Belknap Indian Community." *Id.*

72.     Archived records from the Domain Name Registration database show the website riverbendcash.com was registered on March 23, 2012, to My Cash Center, LLC, 1614 Hampton Rd., Texarkana, TX 75501.

73.     Like Sky Trail Cash, the administrative contact was Humphry, the Chief Financial Officer of the Pruett-owned DMP Investments LLC.

74.     The purported owner of riverbendcash.com, the Fort Belknap Indian Community ("**Fort Belknap Tribe**"), is a small tribe in rural Montana.

75.     Although smaller in overall operation, the Fort Belknap Tribe operates in a manner very similar to the LDF Tribe, with about a dozen online payday loan websites, each under a different tribal company's name which is "rented" to a different non-tribal beneficial owner.

76.     Funds from the "tribally" owned Riverbend Cash loans funnels through RBC Servicing, LLC ("**RBC**"), a Texas company owned by Pruett. "RBC" stands for "River Bend Cash."

### RBC and STS Reports They Originated Loans on Reports to Credit Bureaus

77.     Frequently, Pruett, through STS and RBC, reports tradeline data about loans made through Sky Trail Cash and Riverbend Cash to various consumer reporting agencies

("**CRAs**") which specialize in servicing the needs of online payday lenders, such as Clarity Services, Inc. ("**Clarity**"), FactorTrust, Inc. ("**FactorTrust**"), and DataX, Ltd. ("**DataX**").

78.     Tradeline data reported to FactorTrust about the STS loans indicates the name of the lender is "Skytrail Servicing Group, LLC, 1614 Hampton Road, Texarkana, TX 75503."

79.     Tradeline data reported to FactorTrust about the RBC loans indicates the name of the lender is "RBC Servicing Group, LLC, 1614 Hampton Road, Texarkana, TX 75503."

80.     Thus, according to Pruett's own reports to FactorTrust, the Sky Trail Cash and Riverbend Cash loans are **actually made by STS and RBC**, companies that public records show Pruett owns and controls and are not, as the websites skytrailcash.com and riverbendcash.com claim, made by the tribal Ningodwaaswi, LLC and Riverbend Finance, LLC.

### STS Correspondence With CRAs

81.     When STS requests deletion of previously-reported tradeline data reported to CRAs to whom it furnishes data, it does so by writing a letter to the CRAs on letterhead styled:

**Sky Trail Servicing Group, LLC**
**5904 Summerfield Drive, Texarkana, TX 75503**
**Telephone: 903-791-0151**

82.     The phone number listed on the letterhead belongs to Pruett, as does the address.

83.    The deletion request letters are signed by Humphry – the same Pruett employee whose name appears on the Domain Name Registration records.

### STS Agents Take Customer Service Phone Calls Far From LDF Reservation

84.    Calls to the only customer service phone number listed on Sky Trail Cash's website, 844-650-5931, are answered by STS employees in Pruett's Texarkana office (although, on information and belief, many STS employees are answering calls from their home due to the current COVID-19 pandemic).

85.    Calling 844-650-5931 on July 9, 2020 and speaking with a customer service representative who answered the call, "Sky Trail Cash," resulted in the customer service representative confirming the caller had reached STS and that the customer service representative was taking the call in Arkansas, "near" Texarkana.

### CRA Inquiries Contain STS' Texarkana, Texas Address

86.    When evaluating a consumer for a potential loan offering from Sky Trail Cash, STS frequently obtains credit reports from Clarity and other CRAs. A record of those inquiries is generally logged by the CRAs.

87.    STS uses its actual address – 1614 Hampton Rd., Texarkana, TX 75503 – when obtaining credit reports from CRAs like Clarity, who then often obtain supplemental information from larger, traditional CRAs like Experian.

## Sky Trail Cash Does Not Qualify for Sovereign Immunity

88.     While the general rule established by our courts is that an entity which functions as an arm of the tribe shares that tribe's sovereign immunity, the relationship to the tribe and function / operation of the entity require review and analysis. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010), (holding "tribal sovereign immunity may extend to subdivisions of a tribe, including those engaged in economic activities, **provided that the relationship between the tribe and the entity is sufficiently close to properly permit the entity to share in the tribe's immunity**") (**emphasis added**).

89.     In particular, the LDF Tribe has no substantive involvement in the operation of STS. Working capital to fund loans is provided by Pruett and his investors; calls are taken by STS employees and agents; credit inquiries made with the CRAs contain STS' Texas address; reports to CRAs about their loans bear the name of STS or RBC and Texas addresses; web servers are located in Texas; requests for deletion of information reported to CRAs bear STS' name, Texas address, Pruett's phone number, and are signed by Humphry.

90.     Indeed, the relationship between LDF and Sky Trail Cash does not begin to suggest that Sky Trail Cash is an "arm of the tribe," as the LDF Tribe's involvement is limited to: (a) claiming ownership of the lending operations; and, (b) receiving royalty fees monthly from STS for the use of the tribe's name in dealing with consumers and defending lawsuits.

91.     Just so, the majority of courts have adopted the framework laid out in *Breakthrough,* at 1187-88, to determine if an entity alleged to be acting as an arm of the tribe should be entitled to immunity.  Specifically, the court analyzed:

    a.   [the entities'] method of creation;

    b.   their purpose;

    c.   their structure, ownership, and management, including the amount of control the tribe has over the entities;

    d.   whether the tribe intended for the entities to have tribal sovereign immunity;

    e.   the financial relationship between the tribe and the entities; and,

    f.   whether the purposes of tribal sovereign immunity are served by granting immunity to the entities.

92.     Pursuant to the framework laid out in *Breakthrough*, Sky Trail Cash, like all of the other 50+ payday loan websites supposedly operating from the second floor of a small retail store, fails in virtually every aspect.

93.     The capital used to fund Sky Trail Cash's payday loans comes from Pruett, his investors, and/or other unknown, non-tribal entities, which also manage the business, its marketing, underwriting policies, and all other key elements of the enterprise.

94.     Pruett and the other non-tribal investors receive the vast majority of the payday loan profits while the Tribe receives a tiny fraction of overall revenue, in the range of 2%, for playing the role of straw owner of the business.

### **Method of Creation**

95.     With respect to the method of creation and circumstances surrounding it, LDF Holdings did not start its own lending enterprise but rather slapped its name onto an already-established business, formed by a non-tribal individual.   The earliest Domain Name Registration records show that the Sky Trail Cash website was registered by the Pruett-owned My Cash Now LLC, operating out of Texarkana, Texas, where, more than eight years later, virtually all business continues to be conducted.

96.     The repurposing of a pre-existing entity suggests that sovereign immunity is not supported. *See Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 272 (E.D. Va. 2018) (stating "the Tribe was not starting an independent lending operation but rather facilitating the absorption of Red Rock's fully-functioning lending enterprise which had a decidedly non-tribal character").

## Purpose

97.     With respect to the entity's purpose, a court must decide whether it relates to the "broader goals of tribal self-governance," separate from economic activities, or if "the entity was created solely for business purposes and without any declared objective of promoting the tribe's general tribal or economic development." *Williams*, 329 F. Supp. 3d at 273 (citing "*People ex rel. Owen v. Miami Nation Enters*, 2 Cal. 5th 222, 245 (Cal. 2016)).

98.     Evidence of "the number of jobs [the entity] creates for tribal members or the amount of revenue it generates for the tribe" suggests that it is an arm of the tribe, but "evidence that the entity engages in activities unrelated to its stated goals or that [it] actually *operates to enrich primarily persons outside of the tribe* or only a handful of tribal

leaders" shows the opposite. *People ex rel. Owen v. Miami Nation Enters.*, 2 Cal. 5th 222 (Cal. 2016) (emphasis added).

99.    While the LDF Tribe has some nominal involvement in LDF Holdings and its related lending companies, only a handful of tribal members are employed in payday lending in general; the real management, control, and financial benefit rests with non-tribal entities and persons.

100.    Less than 3% of lending revenues actually flow into the LDF Tribe, with the remainder going to the myriad non-tribal beneficial owners and investors.

101.    Thus, the primary purpose that non-tribal investors had in helping LDF Holdings create payday websites like Sky Trail Cash was to *enrich themselves,* not the LDF Tribe.  The few pennies received by the LDF Tribe suggest that the primary purpose was not to benefit the Tribe.

### Structure, Ownership, and Management

102.    Each of the non-tribal entities who enter into agreements with the LDF Tribe control their own lending business – deciding the terms and conditions under which they will make loans and making all substantive lending decisions.

103.    Non-tribal individuals perform the lion's share of the work required to run Sky Trail Cash, including the underwriting, collection, and servicing of the loans.

104.    When a consumer applies for a loan, software controlled by STS and Pruett assigns a "risk score" to the applicant. Neither STS nor Pruett has ever revealed to LDF Holdings how the "risk score" is calculated.

105.    LDF Holdings and the LDF Tribe have no say in which loans are funded.

106.    Courts have found these facts to be contrary to the successful assertion of sovereign immunity. *See Williams*, 329 F. Supp. 3d at 279 (finding that a similar non-tribal entity exerted control over a purportedly tribal payday lender by unilaterally determining the criteria for prescreened credit offers).

### Whether the Tribe Intended to Confer Immunity and Whether Extending Such Protection Serves the Purpose of Such Immunity

107.    The LDF Tribe has a vested-interest in conferring sovereign immunity on the entities it establishes to enable payday lenders to engage in usury – and thus clearly intended to do so.  The larger question, however, is whether the attempt to confer immunity furthers the purpose of allowing Indian tribes to claim sovereign immunity.

108.    The purpose for allowing Indian Tribes the privilege of claiming sovereign immunity stems from a societal policy which promotes self-determination and governance by those tribes.  ("Nonetheless, the doctrine of tribal immunity reflects a societal decision that tribal autonomy predominates over other interests" - *Miccosukee Tribe of Indians of Fla. v. Tein*, 227 So. 3d 656, 666 (Fla. Dist. Ct. App. 2017).)

109.    Allowing rent-a-tribe agreements to enable non-tribal entities to profit from criminal usury does not promote autonomy, self-determination, or any other purposeful value of the privilege.

### Financial Relationship between LDF Tribe and Sky Trail Cash

110.    The LDF Tribe is not the primary beneficiary or even a substantial beneficiary of the operations of Sky Trail Cash.

111.     The LDF Tribe neither funds Sky Trail Cash's loans nor receives significant income from its loans.

112.     Indeed, as aforementioned, the LDF Tribe receives only a small portion of Sky Trail Cash's revenues, at most 3%.

113.     On balance, the financial relationship between Sky Trail Cash and the LDF Tribe suggest that Sky Trail Cash is not, in fact, an "arm of the tribe."

### Breakthrough Analysis Conclusion

114.     Pursuant to the *Breakthrough* Court's analysis Sky Trail Cash does not function as an arm of the tribe, and therefore, cannot escape the purview of state usury laws under the doctrine of sovereign immunity.

115.     Rather, Sky Trail Cash is merely an "alter-ego" of Pruett and his investors and associates.

116.     Sky Trail Cash's loans are therefore not subject to an immunity defense and are unenforceable in the State of Florida.

### TrueAccord's Collection Efforts

117.     In or around January 2020, Sky Trail Cash placed, transferred, or otherwise forwarded the Debt to TrueAccord.

118.     Shortly thereafter, TrueAccord began emailing Mr. Jackson, attempting to collect the Debt.

119.     At this time, TrueAccord alleged that $367.67 was owed by Mr. Jackson.

120.    This $367.67 represents only usurious interest and fees, as Mr. Jackson had already paid back far more than the original principal amount of loan.

121.    One such collection email from TrueAccord was received by Mr. Jackson on April 8, 2020. **SEE PLAINTIFF'S EXHIBIT F.**

122.    The email stated, "If you take care of this matter now you can get back to what matters. And we can mark your debt as paid, and we'll finally stop our collection efforts. So what are you waiting for?" *Id.*

123.    An email from a debt collector is a *Communication* pursuant to the FDCPA. *See Hart v. Credit Control, LLC*, 871 F. 3d 1255, 1257-58 (11th Cir. 2017).

124.    At no point in any of its emails, nor anywhere on TrueAccord's website, did TrueAccord disclose that Florida law prevents Mr. Jackson from being sued for the Debt, as the underlying loan was void.

125.    The failure to disclose that a consumer cannot be sued for a debt is materially misleading to an unsophisticated consumer, especially when paired with prominent language advertising a "settlement" offer since an unsophisticated consumer would believe the debt collector was offering to settle an account for a particular amount in lieu of legal action. *See Baez v. LTD Fin. Servs., L.P.,* No. 17-13842 (11th Cir. Dec. 7, 2018), *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 425, 428-30 (3d Cir. 2018); *Pantoja v. Portfolio Recovery Associates, LLC*, 852 F.3d 679, 684, 687 (7th Cir. 2017*); Daugherty v. Convergent Outsourcing, Inc.*, 836 F.3d 507, 509 (5th Cir. 2016); *Buchanan v. Northland Group, Inc.*, 776 F.3d 393, 395, 399-400 (6th Cir. 2015); and *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010, 1020 (7th Cir. 2014).

126.    Indeed, TrueAccord failed to disclose that the alleged Debt was not owed under Florida law. Upon receiving the email from True Accord, Mr. Jackson believed that the "debt" was legally enforceable against him, and that True Accord would report the account as a collection tradeline to the major credit bureaus, *e.g.,* Equifax, Experian and Trans Union.

127.    The failure to disclose that a debt from a loan shark like Sky Trail Cash is not legally owed under Florida law materially disadvantages an unsophisticated consumer.

128.    Beyond this, the attempted collection of any debt which was *void ab initio* and not actually owed is a *per se* violation of the FDCPA's prohibitions against the use of false and misleading collection tactics.

129.    TrueAccord collects debts for many different online payday lenders, all of whom falsely claim to be owned by various Native American tribes. TrueAccord has been sued multiple times for its involvement in the collection of illegal payday loan debts but continues to accept new debts from online payday lenders, despite knowing their illegal provenance.

130.    TrueAccord's website and emails to Mr. Jackson were *Communications* as defined by 15 U.S.C. § 1692a(2) and Section 559.55(2), Florida Statutes.

## <u>CLASS ACTION ALLEGATIONS</u>

131.    Plaintiff brings this matter as a Class Action, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), on behalf of himself and the following Class:

**All natural persons residing in the State of Florida:**

    (a)    **who, within one year of the date of the filing of this complaint, received collection correspondence, including any e-mail, phone call, or other communication, from True Accord regarding any alleged Sky Trail Cash debt being owed ("FDCPA Class"),**

    (b)    **who within two years of the date of the filing of this complaint, received collection correspondence, including any e-mail, phone call, or other communication, from True Accord regarding any alleged Sky Trail Cash debt being owed ("True Accord FCCPA Class"),**

    (c)    **who within two years of the date of the filing of this complaint, received collection correspondence, including any e-mail, phone call, SMS message, or other communication, from STS regarding any alleged Sky Trail Cash debt being owed ("STS FCCPA Class"),**

    (d)    **who within five years of the date of the filing of this complaint, received collection correspondence, have paid any usurious interest, fees, or similar to STS ("STS CRCPA class"),**

132.    Plaintiff reserves the right to amend the definition of the Classes based on subsequent discovery or legal developments.

133.    **Numerosity.  Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical as Plaintiff believes that there are at least two thousand (2,000) similarly-situated persons.  Sky Trail Cash markets itself heavily and makes a considerable number of loans monthly to Florida consumers. Although the precise number of Class members is unknown, the names and addresses of potential Class

members are identifiable through documents and business records maintained by True Accord and STS.

134.   **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**   There are questions of law and fact that are common to the Classes and which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation:

(a)   Whether the collection of interest and fees from loans made to Florida consumers at interest rates exceeding 700% annual interest by Sky Trail Cash violates the FCCPA and CRCPA;

(b)   whether TrueAccord's collection, and attempted collection, of unpaid "collection balances" which resulted from loans made to Florida consumers at interest rates exceeding 700% annual interest by Sky Trail Cash violates the FDCPA; and,

(c)   whether TrueAccord's collection, and attempted collection, of unpaid "collection balances" from usurious loans which were void *ab initio* and not owed without disclosure that the loans are not legally enforceable in Florida and not actually owed violates the FDCPA.

135.   **Typicality.   Fed. R. Civ. P. 23(a)(3).**   Plaintiff's claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories.   Sky Trail Cash makes loans to Florida consumers at rates vastly exceeding the maximum lawful rate.   TrueAccord uses a series of pre-written e-mail messages to collect these usurious debts from Florida consumers, and, on information and

belief, the e-mails received by Mr. Jackson are identical to the e-mails received by thousands of other Florida consumers.  Plaintiff has no interest adverse or antagonistic to the interests of other members of the Class, and has the same claims for statutory and actual damages that he seeks for absent Class members.

136.    **Adequacy of Class Representation.  Fed. R. Civ. P. 23(a)(4).**  Plaintiff is an adequate representative of the Class and will fairly and properly protect the interests of the Class.  Plaintiff has retained experienced counsel who have litigated well over five hundred consumer cases under the FDCPA and FCCPA, as well as many other cases under other consumer-protection statutes, including the Fair Credit Reporting Act, Telephone Consumer Protection Act, Rosenthal Fair Debt Collection Practices Act, and other similar consumer protection statutes, are competent in the prosecution of class action litigation, and intend to prosecute this action vigorously.  Plaintiff and his counsel will fairly and adequately protect the interests of members of the Class.

137.    **Predominance and Superiority.  Fed. R. Civ. P. 23(b)(3).**  Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of the FDCPA, FCCPA and CRCPA.  Members of the Class do not have an interest in pursuing individual claims against the Defendants as the amount of each Class member's individual claim is small compared to the expense and burden of individual prosecution.  Class certification will obviate the need for unduly

duplicative litigation that might result in inconsistent judgments concerning the Defendants' practices. Moreover, management of this action as a Class Action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

138.    Absent a Class Action, the Class members will continue to have their rights violated and will continue to suffer monetary and other damages.

139.    Defendant's actions are generally applicable to the entire Class and accordingly, the relief sought is appropriate with respect to the entire Class.

140.    All conditions precedent to this action have occurred, been satisfied, or waived.

## COUNT I
## VIOLATIONS OF THE FDCPA - *TrueAccord*

141.    Mr. Jackson adopts and incorporates paragraphs 1 – 140 as if fully restated herein.

142.    TrueAccord violated **15 U.S.C. § 1692e(2)(a)** when it made false representations regarding the character or legal status of the Debt by falsely representing the Debt was enforceable despite being unenforceable as usurious under Florida law. Likewise, it falsely represented that the Debt so much as existed when, pursuant to Florida law, the Debt was *void ab initio* and STS, the original creditor, forfeited its right to collect any interest or principal when it knowingly made a loan to Mr. Jackson at interest rates in excess of 700% per annum.

143.    TrueAccord violated **15 U.S.C. § 1692e and 1692e(10)** when it used false, deceptive, and misleading representations in connection with the collection of a debt by:

a.    falsely representing the Debt was legally enforceable when it was usurious and unenforceable under Florida law;

b.    falsely representing the Debt actually existed – when, pursuant to Florida law, the Debt was *void ab initio* and STS, the original creditor, forfeited its right to collect any interest or principal when it knowingly made a loan to Mr. Jackson at interest rates in excess of 700% per annum;

c.    falsely representing that the Debt could be legally collected from Mr. Jackson, a Florida resident; and,

d.    failing to disclose that no legal action could be taken against Mr. Jackson for nonpayment.

144.    TrueAccord violated **15 U.S.C. § 1692e(5)** when it threatened action which could not legally be taken, to wit, that it would continue to attempt to collect the Debt from Mr. Jackson, a Florida resident when such actions would be illegal under Florida law.

145.    TrueAccord violated **15 U.S.C. § 1692f** when it a used unfair and unconscionable methods to collect a debt. TrueAccord has collected illegal payday loan debt from Florida residents for years, and was well aware that its collection efforts against Mr. Jackson and his fellow Florida consumers were not legal. Yet, TrueAccord embarked on a blitzkrieg of email collection communications, attempting to collect a debt it knew was not legally owed.

146.     TrueAccord violated **15 U.S.C. § 1692f(1)** when it attempted to collect an amount which included an illegally applied interest rate of 780 percent per annum, when such fees are felonious under Florida criminal statutes. *See* Section 687.071(3), Florida Statutes.

147.     TrueAccord's actions were willful and intentional and representative of their normal business practices.

**WHEREFORE**, Plaintiff and Class pray for relief as follows:

a.     An order certifying this case as a class action on behalf of the proposed Class under Federal Rule of Civil Procedure 23 and appointing Plaintiff and the undersigned counsel of record to represent same;

b.     An award of statutory and actual damages for the Class members;

c.     An award of pre-judgment and post-judgment interest as provided by law;

d.     An award of attorneys' fees and costs; and,

e.     Such other relief as the Court deems just and proper.


**COUNT II**
**VIOLATIONS OF THE FCCPA - *TrueAccord***

148.     Mr. Jackson incorporates paragraphs 1 – 140 as if fully restated herein.

149.     TrueAccord violated Section **559.72(9)**, Florida Statutes, when it attempted to enforce a debt against Mr. Jackson which it knew was illegitimate and unenforceable due to the application of an annual interest rate in excess of 780 percent.

150.     TrueAccord violated Section **559.72(9)**, Florida Statutes, when it asserted legal rights existed which do not exist – to wit, the collection of the Debt from Mr. Jackson,

and the collection of interest on a loan made at over 780 percent annually – despite the Debt being rendered null and void by Florida statute.

151.   TrueAccord's actions were willful, intentional, and done for the express purpose of collecting an unenforceable debt from Mr. Jackson and profiting from it.

152.   TrueAccord knew the illegal nature of the Debt as a result of multiple prior lawsuits filed against it for substantially similar collection attempts.

153.   By its conduct, TrueAccord is liable for the above-stated violations of the FCCPA.

**WHEREFORE**, Plaintiff and Class pray for relief as follows:

a.   An order certifying this case as a class action on behalf of the proposed Class under Federal Rule of Civil Procedure 23 and appointing Plaintiff and the undersigned counsel of record to represent same;

b.   An award of statutory, actual and punitive damages for the Class members;

c.   An award of pre-judgment and post-judgment interest as provided by law;

d.   An award of attorneys' fees and costs;

e.   Injunctive relief prohibiting True Accord from collecting any debt related to Sky Trail Cash; and,

f.   Such other relief as the Court deems just and proper

## COUNT III
## VIOLATIONS OF THE FCCPA – *STS and Pruett*

154.   Mr. Jackson incorporates paragraphs 1 – 140 as if fully restated herein.

155.     Pruett and STS violated Section **559.72(9)**, Florida Statutes, when they attempted to enforce a debt against Mr. Jackson which they knew or should have known was illegitimate and unenforceable due to the application of an annual interest rate in excess of 780 percent.

156.     Pruett and STS violated Section **559.72(9)**, Florida Statutes, when they asserted the existence of a legal right which does not exist, to wit, collecting usurious interest on a $275 loan which carried an interest rate of 780%, more than 20 times the legal limit in Florida. No such right to collect a debt of this nature exists, and, to the contrary, the collection of this debt was expressly prohibited by Florida law.  The fact that Pruett and STS engaged in an elaborate hide-the-shell game to obfuscate true ownership of the enterprise establishes that Pruett and STS were well aware the debts were illegal, as evidenced by their attempts to make it *appear* that an Indian tribe was collecting the debt, and not them.

157.     The actions of Pruett and STS were willful, intentional, and done for the purpose of collecting an unenforceable debt from Mr. Jackson.

158.     By their conduct, STS and Pruett are liable for the above-stated violations of the FCCPA.

**WHEREFORE**, Plaintiff and Class pray for relief as follows:

a.     An order certifying this case as a class action on behalf of the proposed Class under Federal Rule of Civil Procedure 23 and appointing Plaintiff and the undersigned counsel of record to represent same;

b.      An award of statutory, actual and punitive damages for the Class

members;

c.      An award of pre-judgment and post-judgment interest as provided by law;

d.      An award of attorneys' fees and costs;

e.      Injunctive relief prohibiting True Accord from collecting any debt related

to Sky Trail Cash; and,

f.      Such other relief as the Court deems just and proper

## COUNT IV
## VIOLATIONS OF THE CRCPA – *STS and Pruett*

159.    Mr. Jackson adopts and incorporates paragraphs 1 – 140 as if fully restated

herein.

160.    STS and Pruett violated Section **772.11(1)**, Florida Statutes, when they

collected an unenforceable debt intentionally and through criminal means by collecting

interest on a usurious debt made at more than 20 times the maximum lawful rate in Florida.

161.    STS and Pruett's actions were willful, intentional, and done with the express

intention of deceiving Mr. Jackson and taking money from him which they had no legal

right to take.

162.    By their conduct, STS and Pruett are liable for the above-stated violations

of the CRCPA.

**WHEREFORE**, Plaintiff and Class pray for relief as follows:

a.      An order certifying this case as a class action on behalf of the proposed

        Class under Federal Rule of Civil Procedure 23 and appointing Plaintiff

        and the undersigned counsel of record to represent same;

b.      An award of treble actual damages for the Class members, or, alternately,

        a minimum of $200 per class member;

c.      punitive damages for the Class members;

d.      An award of pre-judgment and post-judgment interest as provided by law;

e.      An award of attorneys' fees and costs; and,

f.      Such other relief as the Court deems just and proper

**<u>JURY TRIAL DEMANDED</u>**

Mr. Jackson demands a jury trial on all issues so triable.

Respectfully submitted this **February 1, 2021**, by:

**SERAPH LEGAL, P. A.**

<u>/s/ *Thomas M. Bonan*    </u>
Thomas M. Bonan, Esq.
Florida Bar No.: 118103
TBonan@SeraphLegal.com
2002 E. 5th Ave., Suite 104
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

**<u>ATTACHED EXHIBIT LIST</u>**

A          TrueAccord's Florida CCA License
B          Domain Registration for skytrailcash.com, Record Date: November 13, 2012
C          Domain Registration for skytrailcash.com, Record Date: March 28, 2020
D          Physical Location for Servers of skytrailcash.com
E          Google Street View Image of 1614 Hampton Rd., Texarkana, TX
F          TrueAccord's Email to Mr. Jackson, April 8, 2020